In the Matter of the Estate of CHARLES BRADLEY ROWLAND, Deceased.

Surrogate's Court, Kings County, June 11, 1935.

*Phillips & Avery* [*Royd C. Lutz* of counsel], for the executors.

*Cyrus S. Jullien,* special guardian.

WINGATE, S. It is a familiar and well-established general rule of estate administration that, as between the life tenant and the remainderman, the former is bound to pay ordinary expenses of maintenance of the property forming the subject-matter of a trust. " The usual purpose of the testator in providing for a beneficial interest in a trust estate is, that the net income shall be applicable only, and that the corpus, or capital, of the trust estate shall remain intact until the trust shall have determined. The principle has been so long and firmly established that interest on mortgages, taxes, repairs and all those current expenses, which are fairly incidental to the maintenance of the realty used by a life tenant, are payable by him, that it should be adhered to upon all occasions, unless, in so doing, we violate a plain direction to the contrary; which, if not found in the will in so many words, yet is the only one which a fair and reasonable construction permits of our finding " (*Matter of Albertson,* 113 N. Y. 434, 439); " to justify * * * an exception to the rule the intent should

be expressed in the very clearest manner " (*Matter of Stevens*, 187 N. Y. 471, 476).

The problem of testamentary interpretation here presented is as to whether the terms of the present document demonstrate a compliance with this requirement of such a " very clearest " intent to avoid the general rule, that a determination that it does not apply " is the only one which a fair and reasonable construction permits."

The will was initially probated in the State of Connecticut, which was the jurisdiction of domicile of the testator, but was subsequently made the subject of an independent probate proceeding in this court.

By the main dispositive provisions, $150,000 was given outright to the widow, and trusts of $100,000 each erected for two of testator's children, with portions of the principal payable on their attainment of specified ages. The residue of the estate was erected into a trust " to receive the income and profit thereof and apply the same to the use of my wife during her life." Upon her death the principal is payable to the then living descendants of the testator, *per stirpes*, or in default thereof, to testator's heirs at law.

The crux of the question of interpretation centers on the language employed in three items of the will. In the sixth, after appointing his wife and brother as trustees of the trusts for the children, the testator wrote: " I empower the qualifying executor or executors to sell such of the securities of which I may die possessed, exclusive of my stock in the Continental Iron Works, as may be needed to constitute the principal of said trusts."

The tenth item reads as follows: " It is my desire that the portion of my estate represented by my interest in The Continental Iron Works, and the joint interest I have with my brother, Thomas Fitch Rowland, Jr., in the real estate devised to us by our honored father, Thomas Fitch Rowland, shall be handled in conjunction with the interest of my said brother in such properties, if practicable, to the end that each of us may obtain the same benefits from their manipulation."

The thirteenth item, after appointing his wife, brother and cousin as executors, and dispensing with the giving of security by them, provides: " I authorize and empower them as such and as Trustees to retain for investment or for specific distribution any securities of which I may die possessed, with power to sell the same and reinvest the proceeds and to sell my real estate at public or private sale and to lease or mortgage the same."

This will bears date, and was presumably executed on November 2, 1918. In order to obtain an accurate pertinent picture of the

situation of the testator at that time, it will be necessary to advert to certain uncontroverted allegations of the amended petition and of Schedule 17 of the account.

Testator's father was apparently largely interested in a business known as the Continental Iron Works, which seems to have been largely, if not wholly, a family concern. He was also the owner of ten lots of land in Brooklyn which he leased to the Continental Company on May 1, 1903, at an annual rental of $15,000. This lease was continued from year to year thereafter. At the time of his death, in 1907, this real property was devised to the present testator and his brother as tenants in common, and was so owned by them at the time of the execution of the present will, the occupancy by the Continental Company being still in effect.

In the latter part of 1927, more than a year after the death of the present testator, the Continental Iron Works discontinued business and surrendered its lease. The real property in question has, since that time, been a source of expense rather than of revenue. Taking the total period of the accounting, from November 1, 1926, to May 2, 1932, the total expenses chargeable to the estate for its maintenance amounted to $60,272.30, while during the same period the total income received by the estate from the operation of the property amounted to only $15,834.35, thus showing a deficit of $44,437.95.

The executors and their co-owner have made continuous efforts to sell the property and, in fact, actually sold certain portions thereof, realizing a net sum for the estate of $16,481 from the sales.

The question of interpretation respecting the allocation of expenses of maintenance of this real estate accordingly assumes a dual aspect, *first*, as to the part of the property which still remains unsold, as to the portion of the carrying charges, if any, which may be assessed against principal and is to be refunded to the life tenant as and when it is sold; and, *second*, as to the moiety sold, as to what portion, if any, of the sale price she is entitled to receive. Both questions involve the same legal principles, and resolve themselves into the single query of whether the sole reasonable interpretation of the testamentary directions demonstrates the very clearest intent on the part of the testator that a proportion of the ordinary expenses of maintenance shall be charged against the remaindermen.

It is patent from a reading of the pertinent provisions of the will hereinbefore quoted, that the testator made no express direction respecting this presently important question. The inquiry, therefore, resolves itself into one of whether the general testamentary scheme disclosed, when viewed in the light of the demonstrated

circumstances of the testator, at the time the testamentary language was written, result in an inevitable inference of his intention to have such an apportionment of carrying charges made.

In an interpretation of the effect of the testator's language, five decisions of the Court of Appeals are so especially pertinent that they will be examined in chronological sequence.

In *Lawrence* v. *Littlefield* (215 N. Y. 561) testatrix left personal property which was substantially exhausted in the payment of legacies and general expenses, and real estate worth $8,000,000, which was unproductive, producing less than the carrying charges. In a former action for construction, brought in the Supreme Court, to which all interested persons were parties, it was determined that " the power of sale contained in the will was an imperative one * * * and that there was an equitable conversion " of the property in question (p. 567). In this situation the query presented, and which was determined in the affirmative, was as follows (p. 568): " under a will creating a trust of unproductive real estate, income payable to a life beneficiary and remainder to others, with an imperative power of sale and equitable conversion of the real estate into personalty at the death of the testator, with actual sale and conversion accruing only after a considerable delay, the testator will be held to have intended that the proceeds thus and when realized should be apportioned between income payable from the time of his death to the life beneficiary and principal belonging to the remaindermen."

The will in *Spencer* v. *Spencer* (219 N. Y. 459) erected a trust for testator's widow which contained a farm which was practically unproductive during his life and so continued in the hands of his trustees. It was demonstrated that the carrying charges of the farm exhausted the entire income of the trust. It was held (p. 467) that the giving to the widow of the income from an unproductive farm was a mockery which would not be imputed to the testator and that its carrying charges should not be assessed against her income (p. 468).

*Furniss* v. *Cruikshank* (230 N. Y. 495) presented similar facts, in that the sole property available for the erection of the trusts was totally unproductive during the testator's life and so continued subsequent to his death until it was finally sold. In line with the decision in *Spencer* v. *Spencer,* it was determined that an imperative power of sale had been intended by the testator, merely the time of its execution being submitted to the discretion of his fiduciaries, wherefore, the life tenant was entitled to a proportion of the sums realized from the sale.

The question of apportionment in *Matter of Jackson* (258 N. Y. 281) concerned the proceeds of sale of certain wholly unproductive real estate which had been purchased for speculative purposes and was held by a wholly owned corporation. Nothing had ever been received upon it by the testator. It was held that on the sale, the sizable profits realized should be apportioned between the life tenant and the remainderman.

In the foregoing cases the life tenants of the several trusts who were held entitled to apportionment, in spite of the absence of directly and obviously mandatory directions in the wills, were either the widows or children of the particular testators, and this circumstance was accorded weight in the *rationes decidendi* of the several opinions. In the will in *Matter of Satterwhite* (262 N. Y. 339), the one claiming that an apportionment should take place was a brother of the deceased. The court applied the same rule of apportionment in respect to one parcel of unproductive real estate where a positive direction for sale was included in the will, but refused to do so with another in respect to which the power was permissive only, stating (p. 346): " it is the obvious intent of the testator alone which justifies the inference that ' the first object of his solicitude ' should have the advantage therein bestowed on him."

In the same opinion the court, in rejecting the principle that the proceeds of sale of unproductive real estate should in all cases be apportioned between life tenant and remainderman except where the will otherwise provides, says (at p. 343): " We still seek the intention of the testator as expressed in the language of the will, interpreted in the light of surrounding circumstances."

The rules of decision deducible from an analysis of these authoritative determinations are as follows:

A. Carrying charges of unproductive real property will be apportioned between income and principal, or the sales prices of such property will be apportioned between life tenant and remainderman:

1. If there is an imperative direction for sale thereof contained in the will, or

2. If it is inferable from the situation of the testator at the time of the drawing of the will that he desired that arrangement to be made.

B. An intention to have such apportionment made will be imputed to the testator:

1. If the life tenant was a primary object of the testator's bounty, and

2. If the testator knew that the inclusion of the property in question would wholly or materially destroy the value of the gift.

The prerequisite to such relief indicated in B-2, *supra*, has not received extended comment in any of the decisions hereinbefore reviewed, but is an essential element on primary principles of testamentary construction.

The testator is acquainted with the circumstances which surround him at the time of the execution of the will, and these enter into his plans and color his intent. He has no knowledge of future events, and, consequently, happenings subsequent to the date of the instrument cannot be considered in determining what he desired. (*Matter of Frank*, 153 Misc. 688, 689; *Matter of Dooley*, Id. 533, 534; *Matter of Weil*, 151 id. 841, 848; *Matter of Hoffman*, 146 id. 535, 537; *Matter of Mann*, 145 id. 360, 361; *Matter of Marsh*, 143 id. 609, 615; *Matter of Mehler*, Id. 63, 64; *Matter of Tuozzolo*, 141 id. 251, 253; *Matter of Sheffer*, 139 id. 519, 522; *Matter of Smallman*, 138 id. 889, 896.)

The entire theory upon which apportionment is awarded in a case of this type is that where the testator is aware that a certain item of property will prove a material detriment to the life tenant, rather than a benefit, by reason of its known unproductiveness, and such life tenant is one particularly a subject of his bounty, he must have intended a beneficial gift. This inference is deemed to be more cogent than that which arises from the customary connotation of language, unless explicitly to the contrary. Consequently apportionment will be decreed. Where, however, as in the case of the bulk of the property here in question, it was substantially productive at the time of the execution of the will, had been so for almost a generation previous, and so continued for another decade, the facts contradict any inference of intention on the part of the testator for equitable conversion, since no inference can be indulged that the testator possessed clairvoyant powers.

The result, from the standpoint of the life tenant, is unfortunate, though no more so than the experiences of life tenants of innumerable other trusts during these days of depression of values and failure of business enterprises. Had the Continental Iron Works continued to be the successful concern which it apparently was at the time the will was executed, and presumably continued until subsequent to the death of the testator, the income from this real property would have proved a substantial benefit to the life tenant. It seems obvious from the phraseology of the sixth and tenth items of the will that the testator had no thought that any other condition would eventuate. Under such circumstances, the court is powerless to rewrite the will and to attribute to the testator an intention which obviously did not exist when the will was executed.

The foregoing disposes of the main contentions of the life tenant which concern the Continental real estate. There was, in addition, a single lot adjacent to this property which was unproductive during the testator's life and so continued up to the time of its sale. This was of slight comparative value and it has not been demonstrated that the maintenance expenses connected with it were considerable. In this situation, the inference that the testator intended to confer a negligible additional benefit upon the widow is not sufficient to overcome the inference arising from the obviously wholly discretionary power of sale granted the trustees in respect to it.

It must accordingly be held that the usual rule enunciated in *Matter of Albertson (supra)* governs, and that the ordinary expenses of maintenance of the realty must be borne by the life tenant.

Enter decree on notice.