In the Matter of the Estate of JOHN B. MANNING, Deceased.

Surrogate's Court, Westchester County, July 8, 1937.

*Olcott, Paul, Havens & Wandless,* for Herbert Aram and the Corn Exchange Bank and Trust Company, as testamentary trustees.

*Albertson & Scoble* [*J. Lester Albertson* of counsel], for Henrietta Fox, legatee and trust beneficiary.

*Wilson, Huntington & Lord,* for certain remaindermen.

*J. Mayhew Wainwright,* special guardian.

SHEILS, S. Objections were filed in this accounting proceeding by Henrietta Fox, a legatee under the will. Evidence was taken before the former surrogate, but he died before rendering a decision.

On the hearing all the objections but one were either withdrawn or settled by stipulation between the parties.

As to the fourth objection, relating to the computation of commissions, it was stipulated on the record that the accounting trustees be allowed one-half commissions for receiving the sum of $18,065.15, instead of the amount set forth in the account.

The only question remaining to be decided relates to that part of objections numbered 1, 6 and 7, which allege in substance that on or about August 8, 1932, the accounting trustees required the objectant, Henrietta Fox, to pay certain taxes amounting to $3,305.51 on real property in which a life estate had been given to her by the decedent's will; that the said property was non-productive and that the said taxes should be charged against the principal of the estate fund held for her life.

John B. Manning died on September 2, 1929, possessed of an estate of about $2,000,000. He left a will and seven codicils thereto, all of which were admitted to probate on October 9, 1929. The will was executed on January 2, 1920. By the second paragraph thereof he gave $50,000 " to my friend Henrietta Fox to be and become her property absolutely and forever." The remainder of the decedent's property is directed to " pass to the person or persons to whom the same would have descended or have been distributed by law, had this will not been made."

The first codicil to the will is dated September 15, 1921. By paragraph first he gives " all the furniture in, and the contents of, the house and garage on the premises at Davenport Neck, New Rochelle, N. Y., where I now live, and all the live-stock on said premises at the time of my death, to Henrietta Fox."

The second paragraph of the first codicil contains the following: " I authorize and empower The Corn Exchange Bank, the Trustee hereinafter named, to sell the said real estate and premises at any time during the life-time of the said Henrietta Fox, * * * but I direct that the said house and premises be not sold during the life-time of the said Henrietta Fox except upon her consent in

writing, over her hand and seal and duly acknowledged and to be recorded with the deed thereof; and in case of such sale the proceeds thereof shall be at once paid over to the said Trustee, which shall invest the same in safe securities in its discretion, and shall quarterly pay over the net income therefrom to the said Henrietta Fox, or apply the same to her use, in lieu of her life interest in the said premises; or such proceeds may in the discretion of the said Trustee be invested in whole or in part in the purchase of another house and premises, of which the said Henrietta Fox shall have the use during her life, as above provided in respect of the Davenport Neck property."

The remainder is contingent and vests in those people who are the testator's heirs at law when Henrietta Fox shall die.

By the third paragraph of the codicil a trust is created in the sum of $200,000 for the use of Henrietta Fox during her life.

By article fourth of the first codicil the trustees are given discretion to allocate to either principal or income the expenses incidental to the execution of the above trust. This discretion refers only, and is limited to the trust created by article third of the codicil and in no wise to the trust of the *home property*.

Other codicils were made, dated September 20, 1921, and January 21, 1924, and two additional codicils were made July 18, 1929, one relating to the appointment of executors and the other codicil referring to additional gifts, one of which was a gift of certain securities to Mrs. Henrietta Fox " to be hers absolutely and forever."

Another codicil was made on the 24th day of July, 1929, and a further and last codicil was made August 7, 1929. This codicil confirmed the decedent's last will and testament and all prior codicils thereto.

None of the codicils contained any provision revoking the provisions already made for Henrietta Fox.

The accounting parties qualified as testamentary trustees on April 30, 1930. On December 29, 1933, a decree was duly made judicially settling the accounts of the executors.

Henrietta Fox lived for many years in Doctor Manning's household and, after his death, continued to occupy the premises on Davenport Neck until January 5, 1931, when she removed therefrom. During the time of such occupancy she was building a house across the road from the Davenport Neck home, and upon its completion she moved into the house. The Davenport Neck property was appraised, for transfer tax purposes, at $58,750. It was assessed, for tax purposes, at $36,105. It was sold August 2, 1933, for $18,000, the trustees receiving in cash $6,000 and a bond

and mortgage for $12,000, less commissions and disbursements of $1,427.59. Later, the mortgage was foreclosed and the property sold to the trustees on February 27, 1936. The premises are now held by the trustees.

The evidence is that, when Henrietta Fox removed from the property on January 5, 1931, the physical condition of the house was very poor. It was an old-time home on Davenport Neck which had been built many years prior to the decedent's death. It was out-of-date in all respects. The property could not be rented. The house rendered no value to the real estate. The value was in the land. The accumulated taxes amounted to over $3,000. The property was unproductive.

On June 4, 1932, Henrietta Fox paid the sum of $547.40, and on August 8, 1932, the sum of $3,305.51 to the city of New Rochelle for arrears of taxes on the property, which was advertised in a tax sale about to be held by the city of New Rochelle. This was after she had removed from the premises, and, as she maintains, after she had abandoned the use of the property.

Mrs. Fox testified that the trustees represented to her that she should pay the taxes and that she would be reimbursed therefor; that by paying the taxes she would prevent the property going to a tax lien sale and would preserve it for the benefit of the remaindermen. At no time did the trustees indicate the situation to the remaindermen.

The testimony is that, in August, 1932, counsel for the trustees prepared a letter for Mrs. Fox and suggested that she send such letter to the trustees. The proposed and actual letter states that she (Mrs. Fox) had " just been advised that the authorities of the City of New Rochelle intend to list the Manning property for sale for non-paid taxes this Fall and I am, therefore, making payment of the 1930, 1931 and 1932 taxes at this time so as to make the property free and clear and avoid any further argument or difficulty with the members of the Manning family. While I am making this payment, as I have been advised by Mr. Stitt it is my duty to do, because of my position as life tenant, I want to point out to you that so far my enjoyment of the property as life tenant has been purely theoretical and has in fact cost me money. In my opinion the payment of these taxes by me represents a capital expenditure for the benefit of the remainderman, which is, I believe, a proper charge against the principal of the trust because it preserves the trust property intact. I, therefore, respectfully request that you and Mr. Aram take such steps as you may deem necessary to ascertain whether or not I can be reimbursed for the amount of these taxes from the principal of the trust fund."

A few months after the payment of the taxes the trustees sold the property, which had been appraised at $58,750 and assessed for $36,105, for the sum of $18,000.

The parties have stipulated that, in the fall of 1929, soon after the testator's death, Henrietta Fox advised the trustees she wanted the Davenport Neck property sold " as promptly as possible," and that she would consent to a sale thereof.

The general rule of law that it is the duty of a life tenant to pay taxes upon real estate was decided in *Matter of Albertson* (113 N. Y. 434) upon the facts in that case. There are, however, exceptions to this rule.

In *Matter of Wainwright* (248 App. Div. 336, 339) the court said: " Although we are appreciative of the latitude of the bounds of construction which may be invoked to vary the general rule as to payment from income on behalf of a life beneficiary who is plainly the primary object of the testator's bounty (*Lawrence* v. *Littlefield*, 215 N. Y. 561; *Spencer* v. *Spencer*, 219 id. 459; 220 id. 654; *Matter of Jackson*, 258 id. 281), the intention of the testator must govern. (*Matter of Satterwhite*, 262 N. Y. 339, 343; *Matter of Rowland*, 155 Misc. 826; affd., 248 App. Div. 627.) "

The principle of law which relates to this question has occupied the attention of the courts from time to time, and, as the years have rolled on, the courts have liberalized the equitable principle of contribution from corpus for taxes upon unproductive real property. The courts have created a new equitable rule. The rule in the *Albertson* case is reasonable as applied to productive property. Where unproductive real property was carried it has been held that the carrying charges should be paid out of capital. (*Matter of Pitney*, 113 App. Div. 845; *Matter of Martens*, 16 Misc. 245; *Matter of Coombs*, 62 id. 597; *Matter of Montgomery*, 99 id. 473; *Matter of Vermilye*, 100 id. 235; *Matter of Lichtenberg*, 114 id. 89.)

In *Matter of Chapal* (245 App. Div. 818 [2d Dept.]; revd. on other grounds, 269 N. Y. 464) it was said: " The general rule does not apply where the carrying charges are incurred primarily, if not exclusively, to preserve the corpus and keep it intact for the benefit of the remaindermen, or where other special equities are involved which make it unjust to compel the income to bear the carrying charges. (*Matter of Pitney*, 113 App. Div. 845; *Meldon* v. *Devlin*, 31 id. 146; affd., 167 N. Y. 573; *Matter of Marshall*, 43 Misc. 238; *Matter of Menzie*, 54 id. 188; *Matter of Myers*, 161 N. Y. Supp. 1111; *Roosevelt* v. *Roosevelt*, 5 Redf. 264.) "

The instant case is not one where the real property was held for future advancement in value. On the contrary, it had constantly

depreciated in value as evidenced by its appraisement, assessment and the actual sale price received by the trustees.

Under the terms of the will the trustees were authorized and empowered to sell the real estate upon the consent of Henrietta Fox. In *Spencer* v. *Spencer* (219 N. Y. 459), where unproductive real property constituted a very large part of the capital and where the power of sale was not imperative, it was held that, under the circumstances, an imperative power can be *implied* and an equitable conversion effected. It was there held that the carrying charges on unproductive real property should be paid from capital and not from income.

The more recent decisions of the Court of Appeals have given this doctrine a greater impetus. In *Matter of Jackson* (258 N. Y. 281 [1932]) the testator created a trust for his wife for life, with remainder to collaterals. The wife *had property of her own* and, in addition to her interest in the trust, she took under her husband's will a large estate. The court held that the language used was similar to that construed in *Lawrence* v. *Littlefield* (215 N. Y. 561). Before the unproductive realty was sold the surrogate had decreed that the carrying charges there should be charged against principal. The property was thereafter sold and the court decreed an apportionment between capital and income. Here the court said: " In cases of unproductive lands held in trust, apportionments have been made between income and principal of the purchase price when such lands are sold. (*Lawrence* v. *Littlefield, supra; Spencer* v. *Spencer,* 219 N. Y. 459; *Furniss* v. *Cruikshank,* 230 N. Y. 495.) These cases rest on the assumption that the testator did not intend to impoverish or hamper the life tenant with carrying charges for the benefit of the residuary estate." In this case was found the liberalizing of the rule.

These cases deal largely, too, with the principle of apportionment of the proceeds of sale of unproductive real estate.

In *Matter of Satterwhite* (262 N. Y. 339, 345 [1933]) the question was whether taxes on unproductive real estate should be paid by the *life tenant* or apportioned to capital. The testatrix gave her husband *a life estate* in lands known as " Martin Hall," for his occupancy until the time when the same should be sold, as provided in the will. She directed her executors and trustees to sell the property *within three years* and to place the proceeds in the residuary fund of her estate. She placed the residuary estate in trust in part for her husband and in part for others. The testatrix died May 1, 1927. Martin Hall was not sold until September 27, 1930. The court held that the power of sale was imperative as to Martin Hall, but, in view of the provision giving the husband occupancy

until it should be sold, an equitable conversion was *not effective until the actual sale* thereof or until the expiration of three years from the time of testator's death, whichever event should first occur. In the instant case there is no time set for a sale, save as directed by Mrs. Fox.

The assertion in *Matter of Albertson* (113 N. Y. 434) that "unequivocal direction" to the contrary alone shall justify an exception to the rule, must yield to the intent of the testator. (*Matter of Jackson*, 258 N. Y. 281, 289; *Matter of Chapal*, 161 Misc. 67 [Dec. 1934]; modfd., 245 App. Div. 818; revd. and surrogate affd., 269 N. Y. 464; *Matter of Rowland*, 273 id. 100; *Matter of Lott*, 251 App. Div. 333.)

In *Matter of Rowland* (*supra*) the court said (at p. 108): "That the tendency of legislation is toward exempting the beneficiary of a trust from liability for carrying charges on unproductive property and toward apportionment between principal and income of the net proceeds of the sale of such property is indicated by section 11 of the Uniform Principal and Income Act, Uniform Laws Annotated (vol. 9, supplement p. 171), approved by the National Conference of Commissioners on Uniform State Laws in 1931, and already in force in Oregon * * *. That such is proper practice in the administration of trusts is expressed in the Restatement of the Law of Trusts (vol. 1, §§ 240 and 241). * * *

"The principle that a discretionary power of sale becomes an imperative power of sale and effects an equitable conversion in favor of the beneficiary of a trust who is a special object of the testator's bounty, as respects property which becomes unproductive subsequent to the death of the testator is not without authority to sustain it."

The application of the equitable principle of whether the power of sale is mandatory, or imperative, or can be implied to be such, applies to trusts or legal life estates. (*Matter of Schuster*, 123 Misc. 314, 317.)

From the time when Mrs. Fox evidenced her consent to sell the property to and until the spring of 1933, the trustees made every endeavor to sell said real property through contact with real estate brokers, but, presumably on account of the financial conditions of the country, no offer was received nor a contract of sale made until July, 1933.

Under the principles enunciated in the foregoing cases, it is directed that the taxes on the Davenport Neck property from January 5, 1931, when Mrs. Fox removed from the property, and which amount to $2,193.74, be refunded to Mrs. Fox by the trustees from the principal of the trust estate.

Settle decree on notice.